# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

NANCY M. BENTLEY,

      **Plaintiff,**

v.                                **Civil Action No. 1:13CV163**
                                      **(The Honorable Irene M. Keeley)**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This action is for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant" and sometimes "Commissioner"), denying Nancy M. Bentley's ("Plaintiff") claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff had filed four (4) prior applications, which were denied at the initial levels or upon reconsideration; no hearings were held (R. 23). Plaintiff filed her fifth application on February 19, 2008, alleging disability since June 2, 2005 (R. 182). This application was denied initially on April 17, 2008, and upon reconsideration on September 26, 2008 (R. 73-74). Plaintiff timely filed a request for a hearing, which Administrative Law Judge ("ALJ") Karl Alexander held on January 28, 2010 (R. 78). ALJ Alexander issued an unfavorable decision on March 11, 2010 (R. 78-86). Plaintiff appealed this decision to the Appeals Council, and the Appeals Council remanded the case to the ALJ on September 23, 2011, directing ALJ Alexander to resolve issues relative to a sit/stand option,

inconsistencies between the Dictionary of Occupational Titles ("DOT") and the vocational expert's ("VE") testimony, and Plaintiff's maximum residual functional capacity and to update Plaintiff's medical conditions and obtain supplemental evidence from the VE through hypothetical questions that are based on the record as a whole (R. 92-94). On May 17, 2012, ALJ Alexander held a second administration hearing, at which Plaintiff, who was represented by a lay Social Security advocate, and VE Larry Bell, testified (R. 37-70). On June 22, 2012, ALJ Alexander issued an unfavorable decision (R. 20-36). Plaintiff timely appealed ALJ Alexander's decision to the Appeals Council (R. 18). Her application was denied by the Appeals Council on April 24, 2013, making this the final decision of the Commissioner (R. 6-9).

## II. FACTS

Plaintiff was born on March 10, 1973, and was thirty-nine (39) years old on the date of her second administrative hearing. Plaintiff had a high-school diploma (R. 220). Plaintiff's past employment included cashier, photographer, and day care provider (R. 31, 216).

Dr. Lefebure examined Plaintiff on April 29, 2002, for painful knees. Dr. Lefebure noted he had treated Plaintiff for Blount's disease[1] when she was a child, for which she was treated with epiphyseal fusions that "corrected her rather well." Plaintiff stated she experienced crepitation of and grinding in her knees. Plaintiff had no locking or giving way. Upon examination, Dr. Lefebure found Plaintiff was a "bit heavy." She was "healthy" with "no other active problems." She had "well-healed scars" on both knees. Her knee alignment was "good." Her knees were non-tender. She had good

---

[1]Blount's disease: See *tibia vara*. Dorland's Illustrated Medical Dictionary ("Dorland's"), 32nd Ed., 2012, at 230.
    Tibia vara: median angulation of the tibia (shin bone) in the metaphyseal region, due to a growth disturbance of the medial aspect of the proximal tibial ephiphysis . . . . Dorland's at 1927.

stability, good motion, and no effusion. Plaintiff had "definite subpatellar crepitation, especially upon squatting." Plaintiff walked easily. The x-ray revealed that she had staples that remained in her right knee, but she had "reasonably well preserved joint spaces." Her patellofemoral joint "appeared" intact. She had no staples in her left knee, and the x-ray showed "a little irregularity of the lateral femoral tibial joint space." Her patellofemoral joint "appeared" intact in her left knee. Dr. Lefebure's impression was for bilateral chondromalacia,[2] "perhaps early arthritis from her old Blount's disease of both knees." Dr. Lefebure "counseled" Plaintiff to avoid painful activities, "particularly squatting, bending or flexing her knees, to protect her patellas"; to medicate with Tylenol, Advil, or Aleve; and to use heat to alleviate soreness. Dr. Lefebure informed Plaintiff she was "going to have these types of problems throughout her lifetime, and that chondromalacia may occasionally become acute and at other times quiet" (R. 267, 271-72).

Plaintiff returned to Dr. Lefebure on June 21, 2002, for patellar pain, crepitation, and tenderness. Dr. Lefebure noted Plaintiff was positive for patellofemoral crepitus. She had "good" knee motion. He advised her to rest, use heat, avoid squatting and bending, and take glucosamine to treat her symptoms. He prescribed Vioxx (R. 267).

Plaintiff was treated by Dr. Lefebure on June 18, 2004, for right knee soreness, which was caused by a fall two (2) weeks earlier. Dr. Lefebure noted Plaintiff had no "real giving away or locking." Plaintiff had "some" discomfort. Her knee was not swollen; it was positive for "mild medial laxity . . . but a good endpoint without pain." Plaintiff's anterior-posterior stability "appeared good." Plaintiff walked "easily." Dr. Lefebure "suspect[ed]" Plaintiff had a strain; he instructed Plaintiff to

---

[2]Chondromalacia: softening of the articular cartilage, most frequently in the patella. Dorland's at 352.

engage in non vigorous activities and treat her pain with heat and mild medications. He prescribed Lortab (R. 268).

Plaintiff was treated by Dr. Lefebure on July 7, 2004, for "continue[d]" knee discomfort. Dr. Lefebure noted Plaintiff's x-ray showed "moderate arthritis." Dr. Lefebure "continue[d] to manage conservatively." Plaintiff stated it hurt to walk and she had "difficulty functioning" due to knee pain. She inquired about knee replacement surgery. She "asked about medication," but Dr. Lefebure was "reluctant to give her more Lortabs" and instructed her to medicate with Advil and Tylenol. Plaintiff could walk "reasonably well." Dr. Lefebure noted Plaintiff had two (2) children "who [kept] her rather busy and difficult to function with her knee pain." He instructed Plaintiff to return in one (1) month; he would consider a cortisone injection to her knee (R. 268, 274).

On July 26, 2006, Plaintiff reported to Dr. Lefebure that her right knee "continue[d] to bother" her. Her activities were limited. She was "desirous of getting knee replacement." Dr. Lefebure noted Plaintiff walked "reasonably well," and her knee was "fairly" stable and had good alignment" but there was grinding of the patella. Dr. Lefebure was "hesitant" to perform a knee replacement procedure on Plaintiff due to her being only thirty-three (33) years old. He injected her knee with cortisone (R. 269).

On September 1, 2006, Dr. Lefebure noted Plaintiff's x-ray of her right knee showed "fair amount of medial joint arthritis of that knee and also patellofemoral disease lateral space fairly well preserved." He instructed Plaintiff to wear an "unloader brace." Plaintiff asked "a lot of questions about total knee" replacement. Dr. Lefebure prescribed Celebrex (R. 269, 273).

On September 29, 2006, Plaintiff reported to Dr. Lefebure that Celebrex "seemed to help . . ., even though she [did not] use it all the time." Plaintiff had not gotten the unloader brace. Her left

knee "bother[ed] her a lot" because she had moved, which "really irritated it." Dr. Lefebure continued Plaintiff's prescription for Celebrex and instructed Plaintiff to obtain the unloader brace (R. 269).

Plaintiff phoned Dr. Lefebure on October 11, 2006, and requested a prescription for Lorcet. Dr. Lefebure prescribed Lorcet (R. 269).

On November 6, 2006, Plaintiff telephoned Dr. Lefebure and requested a prescription for Lorcet. Dr. Lefebure noted Plaintiff must "use" the drug "carefully." He prescribed Lorcet (R. 269).

On December 6, 2006, Plaintiff telephoned Dr. Lefebure and requested a prescription for Lorcet; Dr. Lefebure prescribed Lorcet (R. 269).

Plaintiff telephoned Dr. Lefebure on January 11, 2007, and requested that he renew her prescription for Lorcet; he did (R. 269).

Plaintiff telephoned Dr. Lefebure on May 1, 2007, and requested a refill of her Lorcet prescription. Dr. Lefebure provided a refill (R. 269).

On July 27, 2007, Plaintiff telephoned Dr. Lefebure and requested a refill of her prescriptions of Celexa and Lorcet. Dr. Lefebure prescribed those medications to Plaintiff (R. 269).

On September 28, 2007, Plaintiff requested that Dr. Lefebure refill her prescription for Lorcet; Dr. Lefebure honored that request (R. 269).

Plaintiff presented to Dr. Lefebure on November 7, 2007, with complaints of "more pain in the knee." Upon examination, Dr. Lefebure found Plaintiff had no redness, erythema, or infection in her knee. Plaintiff moved her knee "well" and could walk "reasonably well." Dr. Lefebure was "suspici[ous]" that Plaintiff had a "simple flare up of her knee arthritis." He instructed Plaintiff to be "careful" about her activities and use heat to treat her pain. He prescribed Lorcet and advised Plaintiff

to "use that carefully and we don't like her using narcotics on rgular (sic) basis, but there [was] not much alternative." He gave Plaintiff samples of Celexa (R. 270).

Plaintiff received a cortisone injection into her right knee from Dr. Lefebure on December 21, 2007. Plaintiff was scheduled to see Dr. Hamlin on February 5, 2008, for evaluation relative to knee replacement surgery (R. 270).

On January 30, 2008, Plaintiff presented to Family Medicine at United Hospital Center ("UHC") for sinusitis, knee pain, and dysuria. She was prescribed Mobic for knee pain (R. 276). The x-ray made of her right knee showed stable alignment, healing fracture in proximal tibia, degenerative arthrosis, and chondrocalcinosis (R. 288).

Plaintiff telephoned Dr. Lefebure on March 18, 2008, and informed him she "missed" her follow-up appointment with Dr. Hamlin and needed pain medication. She requested a prescription for Lortab. Dr. Lefebure prescribed Lortab (R. 270).

Dr. Lauderman, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff on April 17, 2008. He found Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk for at least two (2) hours in an eight (8) hour work day, sit for a total of six (6) hours in an eight (8) hour work day, and was limited in pushing and/or pulling in her lower extremities (R. 291). Dr. Lauderman found Plaintiff could never climb ladders, ropes, or scaffolds. She could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl (R. 292). Plaintiff had no manipulative, visual, or communicative limitations. Dr. Lauderman found Plaintiff was unlimited in her exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. Dr. Lauderman found Plaintiff should avoid concentrated exposure to extreme cold and heat and vibration. He found Plaintiff should avoid all exposure to

hazards (R. 294). Dr. Lauderman noted Plaintiff's activities were "dictated by how her knee [felt] each day." He considered Plaintiff had pain when she walked, drove a car, stood for prolonged periods of time as she baked or prepared large meals, and climbed stairs. Dr. Lauderman considered Plaintiff's ability to clean her house daily, go out alone, shop occasionally, and maintain personal hygiene. Dr. Lauderman considered Plaintiff's need to have assistance with lifting and carrying. He noted she did not use an assistive device (R. 295). Dr. Lauderman reviewed Dr. Lefebure's July 26, 2006, appointment notes and the January 30, 2008, treatment record from the Family Medicine department at UHC (R. 297).

Dr. Hamlin conducted a consultative examination of Plaintiff on April 29, 2008. He noted Plaintiff had a history of Blount's disease and underwent osteotomies of both proximal tibias when she was a child. He reviewed "radiographs and physical examination" by Dr. Hahn and noted Plaintiff had "neutral to slight valgus alignment to both lower extremities." Plaintiff's x-rays showed "arthrosis throughout both knees," with the right being "a little bit worse." Dr. Hamlin diagnosed degenerative joint disease in both knees. He would schedule her for a total knee arthroplasty (R. 298). The x-rays of Plaintiff's legs showed bilateral osteotomies, mild valgus configuration of her left knee, bilateral knee degenerative changes, and minimal leg discrepancy (R. 301). Specifically, as to Plaintiff's left knee, the x-ray showed osteophytosis of three joint compartments, joint space narrowing, proximal fibula deformity, and medial tibial condyle exostosis. As to Plaintiff's right knee, the x-ray showed chondrocalcinosis[3] involving joint space, mild osteophytosis of degenerative changes, and lateral subluxation of the tibia relative to the femur (R. 302). Dr. Hamlin wrote to Dr. Lefebure relative to

---

[3]Chondrocalcinosis: the presence of calcium salts, especially calcium pyrophosphate in the cartilaginous structures of one or more joints.   Dorland's at 352.

his examination of Plaintiff. He noted the cortisone injections to Plaintiff's knee had provided four (4) to six (6) weeks of pain relief; however they no longer were effective. Dr. Hamlin wrote that Plaintiff had patellofemoral crepitance and clinical valgus alignment of both knees; his diagnoses was for tricopartmental arthritis. Dr. Hamlin wrote that Plaintiff was a candidate for total knee replacement (R. 299).

Plaintiff cancelled her April 30, 2008, with Dr. Kuzbari (R. 309)

Dr. Kuzbari treated Plaintiff on March 31, 2008, for weight loss. Plaintiff reported she did not exercise daily. Dr. Kuzbari injected both knees, prescribed Adipex, and instructed Plaintiff to diet and exercise. Plaintiff's weight was one-hundred, eighty-six (186) pounds (R. 310).

Plaintiff was treated by Dr. Kuzbari on May 19, 2008, for weight loss and knee pain. Plaintiff weighed one-hundred, seventy-nine (179) pounds; she had lost seven (7) pounds. She stated she could lose more weight if she could exercise, but her "knee problems [made] it impossible." Plaintiff requested renewal of her Lorcet prescription. Dr. Kuzbari injected both knees with lidocaine and prescribed Lorcet, Ultram, and Adipex (R. 305-06).

Plaintiff was treated at the Kuzbari Clinic on June 19, 2008, for weight loss, ear pain, and headaches. Plaintiff, who weighed one-hundred, seventy-three (173) pounds, had lost six (6) pounds; she stated Adipex was working "well for appetite control." Plaintiff stated her knee pain was "improving." Dr. Kuzbari prescribed Avelox, Adipex, and Astelin (R. 303-04, 311).

Dr. Lateef, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff on September 25, 2008. Dr. Lateef found Plaintiff could occasionally lift and/or carry up to ten (10) pounds, frequently lift and/or carry less than ten (10) pounds, stand and/or walk for at least two (2) hours in an eight (8) hour work day, sit for a total of six (6) hours in an eight

(8) hour work day, and push/pull unlimited (R. 313). Plaintiff could never climb ladders, ropes, or scaffolds or crawl. She could occasionally climb ramps and stairs, stoop, kneel, and crouch (R. 314). Plaintiff had no manipulative, visual, or communication limitations (R. 315-16). Dr. Lateef found Plaintiff was unlimited in her exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gasses, and poor ventilation; should avoid concentrated exposure to extreme cold and vibration; and should avoid all exposure to hazards (R. 316). He found Plaintiff was credible (R. 317). Dr. Lateef reviewed the December 21, 2007, record of her knee injection; January 30, 2008, knee x-ray; Dr. Hamlin's April 29, 2008, knee evaluation. Dr. Lateef reduced Plaintiff's RFC to sedentary (R. 319).

Plaintiff presented to Dr. Kuzbari on February 2, 2009, with "stomach swelling." She reported she had been medicating with Naproxen and Prednisone. She requested a refill of her prescription for Lorcet. Dr. Kuzbari increased Plaintiff's pain medication. He injected her knees with Toradol. He diagnosed osteoarthritis of her knees, GERD, temporomandibular joint disorder ("TMJ"), and hypertension (R. 331).

On February 2, 2009, Dr. Kuzbari wrote a letter, directed "To Whom It May Concern" and at the request of Plaintiff, that read that Plaintiff "suffered severe osteoarthritis in both knees with severe pain constantly. She is unable to walk 50 yards, sit or stand still for more than twenty minutes at a time" (R. 321).

On February 12, 2009, Plaintiff delivered copies of her right-knee x-rays to Dr. Kuzbari. He noted she had severe osteoarthritis, hypertension, and TMJ. Plaintiff requested a refill of her prescription for Adipex. She had no side effects from that medication (R. 330).

On March 12, 2009, Plaintiff reported to Dr. Kuzbari she had "lost one size." She requested refills of her prescriptions for Adipex and Lorcet (R. 329).

In April, 2009, Plaintiff reported to Dr. Kuzbari she had lost three (3) pounds. Dr. Kuzbari diagnosed osteoarthritis, hypertension, TMJ, and venous hypertension (R. 328).

On May 13, 2009, Plaintiff reported to Dr. Kuzbari that she had been "working out" and had experienced pain in both knees. Plaintiff reported her right knee pain was eight (8) on a scale of one-to-ten (1-10). Plaintiff requested a pain injection in her knee and an increase in her monthly dosage of Lorcet. Plaintiff requested a refill of her Adipex prescription. Dr. Kuzbari noted Plaintiff had osteoarthritis of both knees and diagnosed hypertension, venous hypertension, and TMJ (R. 327).

In June, 2009, Plaintiff requested Dr. Kuzbari provide a pain injection in her knee and refills of her prescriptions of Adipex and Lorcet. Dr. Kuzbari noted Plaintiff was positive for severe osteoarthritis, hypertension, TMJ and venous hypertension. Plaintiff had lost two (2) pounds; she weighed one-hundred, sixty-five (165) pounds (R. 326).

Dr. Kuzari examined Plaintiff on July 14, 2009, for osteoarthritis of both knees, hypertension, TMJ, and venous insufficiency. Plaintiff reported she had right-knee pain; she requested a pain injection. She requested a refill of her prescription of Adipex. Plaintiff reported she had "been running out of her pain med" because she took three (3) pills per day. Dr. Kuzbari injected Plaintiff's right knee with Toradol (R. 325).

On August 15, 2009, Plaintiff reported to Dr. Kuzbari that she had lost five (5) pounds. She had no side effects to Adipex and requested a refill. She requested a pain shot for her knees; Dr. Kuzbari injected Toradol. Plaintiff received a B12 shot; she requested a refill of Lorcet. Dr. Kuzbari diagnosed severe osteoarthritis of both knees, TMJ, depression, and venous insufficiency (R. 324).

Plaintiff reported to Dr. Kuzbari on September 15, 2009, that her knee gave out when she walked; she requested a prescription for a knee brace. She had gained thirty-one (31) pounds. She

requested refills of her Adipex, Lorcet, and Prevacid medications; she requested a pain shot." Dr. Kuzbari noted Plaintiff had severe osteoarthritis of both knees, depression, TMJ, GERD, and right knee scar paresthesias (R. 323).

On October 14, 2009, Plaintiff reported to Dr. Kuzbari that she had lost two (2) pounds. Plaintiff requested a "pain shot." Plaintiff requested medication, which she described as "a small blue pill," for migraine headaches. Dr. Kuzbari diagnosed migraine headaches, osteoarthritis, hypertension, GERD, venous insufficiency, and depression (R. 335).

In November, 2009, Dr. Kuzbari injected pain medication into Plaintiff's right knee, as per Plaintiff's request. Plaintiff requested refills of her prescriptions for Lorcet and Adipex. Plaintiff reported her knee pain was eight (8) on a scale of one-to-ten. Dr. Kuzbari diagnosed osteoarthritis, TMJ, hypertension, and GERD (R. 334).

At Plaintiff's January 20, 2011, appointment with Dr. Kuzbari, she requested refills for prescriptions of Adipex, Lorcet, and Prevacid. She stated she was medicating only with Lorcet and Adipex; she was drug tested and negative for those drugs. Plaintiff stated she had been "out of" Lorcet for two (2) weeks because she had taken one (1) every four (4) hours. Dr. Kuzbari diagnosed osteoarthritis, depression, otalgia, TMJ, "assault," and venous insufficiency (R. 388).

On March 22, 2011, Dr. Kuzbari diagnosed GERD, varicose veins, otalgia, mood disorder, and osteoarthritis (R. 386).

On April 21, 2011, Plaintiff requested refills of her prescriptions for Lorcet and Adipex from Dr. Kuzbari. She refused a vitamin B12 shot. She signed a pain contract. Plaintiff was a "candidate" for treatment by Dr. Burns and needed a referral from her primary care physician. Dr. Kuzbari had treated her for "yrs" and she though he was her primary care physician (R. 384).

In May, 2011, Plaintiff presented to Dr. Kuzbari with allergy symptoms. Plaintiff requested refills of her prescriptions for Lorcet and Adipex. She asked for samples of Zyrtec because her insurance did not reimburse for that medication; samples were provided. Her pain level was seven (7) out of ten (10). Plaintiff was diagnosed with severe osteoarthritis, venous insufficiency, GERD, and mood disorder (R. 383).

In what was possibly at a June, 2011,[4] appointment with Dr. Kuzbari that Plaintiff requested refills of her prescriptions for Adipex and Lorcet. Her pain level was six (6) on a scale of one (1) to ten (10) with "med." Dr. Kuzbari diagnosed GERD, osteoarthritis of the knees, venous insufficiency, and mood disorder (R. 381).

On July 22, 2011, Plaintiff requested that Dr. Kuzbari refill her prescriptions for Lorcet and Adipex. She asked Dr. Kuzbari if a "fluid pill" would help the swelling in her right leg. Plaintiff's pain was nine (9) on a scale of one (1) to ten (10) "without med." Dr. Kuzbari diagnosed osteoarthritis, venous insufficiency, mood disorder, and GERD (R. 380).

Plaintiff requested refills of her prescriptions for Lorcet and Adipex on August 20, 2011, from Dr. Kuzbari. Plaintiff reported she had "hit"her right knee the prior week and was experiencing swelling. Dr. Kuzbari recommended Plaintiff be referred to "ortho"; she wanted "to wait." Dr. Kuzbari diagnosed GERD, mood disorder, osteoarthritis, and venous insufficiency (R. 379).

On August 31, 2011, Plaintiff contacted Dr. Kuzbari's office and requested "written documentation indicating she [was] unable to walk, sit or stand as you wrote before" (R. 377). Dr. Kuzbari complied with the request and wrote that Plaintiff "suffered severe osteoarthritis in both knees

---

[4]There is no date on this medical record; however, the order of the documents in the administrative record indicates that this is a June, 2011, entry.

with severe pain. She [was] unable to walk 50 yards, sit or stand for more than 20 mins. Upon her request I have provided this statement" (R. 369, 378).

In September, 2011,[5] Dr. Kuzbari noted Plaintiff requested a referral to physical therapy for her legs. Plaintiff requested refills of her prescriptions for Lorcet, Nexium, and Flexeril. Plaintiff stated she took up to five (5) Lorcet tablets per day and that "the pain med [did] work on leg pain." Dr. Kuzbari noted the "letter to DHHR worked." He diagnosed tachycardia, GERD, venous insufficiency, osteoarthritis, and mood disorder (R. 376).

In October, 2011, Dr. Kuzbari found Plaintiff was positive for venous insufficiency, mood disorder, GERD, tachycardia, and osteoarthritis. Plaintiff stated she needed refills of her prescription for Lorcet and Adipex; she had no side effects to either drug. Plaintiff stated that Lorcet did "work." Plaintiff had morning stiffness (R. 375).

Dr. Miller referred Plaintiff to Dr. Tallman for leg pain on October 11, 2011 (R. 342).

Dr. Tallman completed a venous duplex scan and insufficiency examination of Plaintiff on November 11, 2011 (358). Plaintiff stated her symptoms were spider veins, leg swelling and pain, and skin changes, bilaterally. Plaintiff stated her symptoms occurred constantly. Plaintiff stated her symptoms were moderate and exacerbated by prolonged sitting or standing. Her symptoms were not relieved by elevation. Her current treatment was elevation, and Dr. Tallman found Plaintiff was in good compliance therewith (R. 364). Dr. Tallman's examinations of Plaintiff's ears, neck, mouth, tongue, eyes, chest, lungs, head, neck, skin, mental status, cardiovascular system, and abdomen were normal (R. 365-66). Plaintiff's gait and station were normal (R. 366). Dr. Tallman found the venous

_____

[5]There is no date on this entry; however, the order of the records in the administrative record permits the undersigned to assume this is a September, 2011, medical record.

duplex scan and insufficiency examinations showed the following: "Marked left greater saphenous vein insufficiency measuring greater than 4.79 seconds in duration"; "Moderate deep venous insufficiency bilaterally"; and "No deep venous thrombosis right or left lower extremity" (R. 358-61). In a letter to Dr. Miller, Dr. Tallman noted the testing confirmed "varicose veins and discomfort of her lower extremities" and "some dilated veins and swelling as well as some skin changes as well as heaviness toward the end of the day." Dr. Tallman also found Plaintiff's pulses were intact. "[F]airly significant insufficiency of mainly the left superficial venous system" was also identified. Dr. Tallman wrote that he recommended Plaintiff treat her condition with compression stockings, which could "alleviate her symptoms altogether." If wearing the stockings were not successful in treating Plaintiff's condition, Dr. Tallman wrote that she "would be a candidate for a left greater saphenous vein closure" (R. 362). Dr. Tallman prescribed compression stockings (R. 363).

Plaintiff presented to Dr. Kuzbari in November, 2011, with complaints of nausea and diarrhea. She coughed. She requested refills of her prescriptions for Lorcet and Adipex. Plaintiff had "sent in papers she needed signed"; Dr. Kuzbari signed them and returned them to Plaintiff. He diagnosed tachycardia, GERD, severe osteoarthritis of the knees, and mood disorder (R. 373).

On November 29, 2011, Dr. Kuzbari completed a Medical Assessment of Ability to do Work-Related Activities Physical as to Plaintiff. Dr. Kuzbari noted he had treated Plaintiff on a monthly basis starting in December, 2009 (R. 338). Dr. Kuzbari noted his medical findings as to Plaintiff, which supported his assessment, were diagnoses of severe osteoarthritis in both knees and venous insufficiency. Dr. Kuzbari found Plaintiff could lift and/or carry ten (10) to fifteen (15) pounds. He did not offer an opinion as to how frequently Plaintiff could so lift. Dr. Kuzbari found Plaintiff could stand and/or walk for ten (10) minutes in an eight (8) hour workday (R. 336). Dr. Kuzbari found

14

Plaintiff could sit for one (1) hour in an eight (8) hour workday. Dr. Kuzbari found Plaintiff could never climb, kneel, or crawl; she could occasionally balance and stoop. He found Plaintiff 's impairment did not affect her ability to reach, handle, feel, see, hear, or speak; her physical limitation affected her ability to push and pull (R. 337). Dr. Kuzbari found the following environmental conditions impacted Plaintiff's impairments: moving machinery, humidity, vibrations, and "other," but she was not restricted in exposure to heights, chemicals, dust, noise, and fumes. Dr. Kuzbari found that the work-related activities of prolonged walking, standing, and sitting were affected by Plaintiff's impairment; he did not list any "medical findings that support[ed] his assessment" (R. 338).

On December 19, 2011, Plaintiff requested that Dr. Kuzbari refill her prescriptions for Adipex and Lorcet. Dr. Kuzbari diagnosed mood disorder, severe osteoarthritis, GERD, tachycardia, and venous insufficiency (R. 372).

Plaintiff presented to Dr. Kuzbari on January 23, 2012, and requested a refill of her prescriptions for Adipex, Lorcet, and Nexium. Dr. Kuzbari diagnosed insomnia, venous insufficiency, GERD, mood disorder, and severe osteoarthritis (R. 371).

Plaintiff presented to Dr. Kuzbari on February 23, 2012, with complaints of right knee swelling and pain. Plaintiff requested refills of her Lorcet and Adipex prescriptions. Plaintiff asked that her prescription for Nexium be changed to a drug that was covered by her insurance. Plaintiff was diagnosed with osteoarthritis, GERD, venous insufficience, and mood disorder (R. 370).

Dr. Kuzbari wrote, on March 21, 2012, that Plaintiff "suffered severe osteoarthritis in both knees with severe pain. She [was] unable to walk 50 yards, sit or stand for more than 20 mins. Upon her request I have provided this statement" (R. 368).

<u>ALJ Alexander's March 11, 2010 Decision</u>

On March 11, 2010, after an administration hearing, ALJ Alexander issued the following decision:

1. The claimant has not engaged in substantial gainful activity since February 29, 2008, the application date (20 CFR 416.971 *et seq.*).

2. Since February 29, 2008, the claimant objectively evidenced degenerative joint disease of the bilateral knees, a severe medically determinable impairment that has significantly limited her ability to perform basic work activity for a period of at least 12 consecutive months (20 CFR 416.920(c).

3. Since February 29, 2008, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926) (R. 80).

4. Since February 29, 2008, the claimant has had the residual functional capacity to perform a range of work activity that: requires no more than a "sedentary" level of physical exertion; affords a sit/stand option; requires no crawling or squatting, no climbing of ladders, ropes or scaffolds, no more than minimal climbing of stairs, and no more than occasional performance of other postural movements (i.e. balancing, crouching, kneeling and stooping); and entails no exposure to temperature extremes, wet or humid conditions or hazards (e.g. dangerous machinery, unprotected heights) (20 CFR 416.967(a)) (R. 81).

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant is appropriately considered for decisional purposes as a "younger individual age 18-44" (20 CFR 416.963).

7. The claimant has a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)) (R. 85).

10.     The claimant has not been under a disability, as defined in the Social Security
        Act, at any time since February 29, 2008, the date the application was filed
        (20 CFR 416.920(g)) (R. 86).

Appeals Council's September 23, 2011, Remand Decision

The Appeals Council granted Plaintiff's request for review of ALJ Alexander's March 11,

2011, decision, and, on September 23, 2011, vacated the hearing decision and remanded the case to

the ALJ for resolution of the following issues:

- ●     The hearing decision indicates that the claimant has a maximum residual
        functional capability for reduced range of sedentary work, hearing decision
        p. 4 with a sit and stand option (Finding 4, page 4). However, the decision
        does not explain the frequency or duration of the claimant's need to alternate
        sitting and standing (Social Security Rulings 83-12 and 96-2p). As explained
        in Social Security Ruling 83-12, where the need to alternate sitting and
        standing cannot be accommodated by scheduled breaks and the lunch period,
        the occupational base for a full range of unskilled sedentary work will be
        eroded. The extent of the erosion will depend on the fact in the case record,
        such as the frequency of the need to alternate sitting and standing and the
        length of time needed to stand. The residual functional capacity assessment
        must[,] therefore, be specific as to the frequency of the need to alternate
        sitting and standing (R. 92).

- ●     The Administrative Law Judge relied on evidence from a vocational expert
        to support the conclusion that the claimant could perform the jobs of
        assembler and mail clerk (Finding 9, page 9). Further, the hearing decision
        indicates that the evidence from the vocational expert is consistent with the
        information contained in the Dictionary of Occupational Titles (DOT)
        (Decision, page 9). However, the vocational expert testified that the claimant
        could perform the work of an assembler or a machine tender, which,
        according to the DOT, are light or medium work in exertion (DOT #
        706.361-010 and 754.685-014). Furthermore, the hearing decision
        incorrectly notes that the vocational expert testified that the claimant could
        perform the work of a mail clerk. According to the Dictionary of
        Occupational titles (sic), a mail clerk requires light exertion (DOT # 209.687-
        026). Further development and evaluation are required to address these
        inconsistencies.

- ●     Update the evidence on claimant's medical conditions consistent with the
        requirements of 20 CFR 416.1512-1513.

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed imitations (Social Security Ruling 96-8p). In particular, the Administrative Law Judge should make a specific finding as to the frequency with which the claimant must change positions (Social Security Ruling 96-9p). In so doing, the Administrative law Judge should evaluate the treating and examining source opinions pursuant to the provisions of 20 CFR 416.927 and Social Security Ruling 96-2p and 96-5p and nonexamining source opinions in accordance with the provisions of 20 CFR 416.927(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating and examining sources to provide additional evidence and/or clarification of the opinion[s] and medical source statements about what the claimant can still do despite the impairments (20 CFR 416.912). The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating sources.

- Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-12 and 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence[,] the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4P) (R. 93).

May 17, 2012, Administrative Hearing

Plaintiff testified at the May 17, 2012, administrative hearing that she was in "constant pain." Her knees swelled and her feet went numb if she sat too long. She felt like there were "little things . . . crawling around" her legs (R. 43). She had to elevate her legs "on the hour" (R. 43, 49). She had no knee cartilage. She had bone spurs; she experienced pain when she walked. Her knees "lock[ed] up." Her right knee was worse than her left. She had bilateral Blount's disease (R. 43). Plaintiff had undergone twelve (12) surgeries on her legs when she was young (R. 44). A doctor had

advised against total knee replacement surgery; however, her current doctor said such a procedure could "possibly" be performed (R. 44-45). Plaintiff described her pain as "burning and throbbing" in her knees and down to her big toe (R. 45-46). Plaintiff felt like there was a "knot" from the front of her knees to the back. Plaintiff testified that she applied heat and took pain medication, which relieved the symptoms "a little bit," but it was always there. Being "on her feet a lot" and climbing or descending stairs exacerbated her symptoms. Plaintiff did not use any assistive devices (R. 46). Plaintiff stated her balance was not "too bad," but she had fallen when her right knee had "give[n] out on her" (R. 47). Plaintiff's sleep was interrupted by her knee pain. Plaintiff stated she wore compression stockings, but they did not "really help much." Plaintiff did not know if she was a candidate for any surgery involving her leg veins (R. 48). Plaintiff stated that during her twelve (12) leg surgeries, the doctor cut through her veins, which caused the blood in the lower part of her legs to not be able to flow properly (R. 49).

Plaintiff testified her children and mother helped her shop. She did not leave her home "too often." When asked by the ALJ if using a cane was a "cosmetic problem" for Plaintiff, she responded in the affirmative. Plaintiff stated that when she shopped at the mall, she did not think she could walk back to the car, and she was embarrassed by this (R. 47).

The ALJ asked the VE the following hypothetical question:

Then let me ask you to assume a hypothetical individual of the Claimant's age, educational background and work history who would be able to perform a range of sedentary work: would require a sit/stand option without breaking pace; and with the added condition that the person could stand – sit and stand for 20 minutes each at a time; could perform postural movements occasionally, but should do minimal to no kneeling, crawling or squatting and no climbing of ladders, ropes or scaffolds (R. 51). Should not do any push/pull motions with the lower extremities. To the maximum extend possible, should walk on level and even surfaces and should not be exposed to temperature extremes, wet or humid conditions or hazards. Would there be any work in the regional or national economy that such a person could perform (R. 51).

The VE responded that such a person could perform the jobs of assembler (R. 51). The job of general sorter would be available, with 50,000 jobs nationally and 350 jobs regionally (R. 52).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Alexander made the following findings:

1. The claimant has not engaged in substantial gainful activity since February 29, 2008, the application date (20 CFR 416.971 *et seq.*) (Exhibit 4A and 3D).

2. Since February 29, 2009, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: degenerative joint disease of the bilateral knees; varicose veins/venous insufficiency of the bilateral lower extremities (20 CFR 416.920(C)) (R. 25).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926) (R. 26).

4. After careful consideration of the entire record, the undersigned finds that since February 29, 2008, the claimant has had the residual functional capacity to preform a range of sedentary work as defined in 20 CFR 416.967(a) with the following limitations: the claimant requires a sit/stand option without breaking task, with the added condition that she has the ability to sit and stand for 20 minutes each time; she can perform postural movements occasionally, except she cannot climb ladders/ropes/scaffolds, should do minimal kneeling, crawling, or squatting, and should do no push/pull maneuvers with the lower extremities; to the maximum extent possible, the claimant should do all walking on level and even surfaces; lastly, the claimant should have no exposure to temperature extremes, wet or humid conditions, or hazards (R. 27).

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on March 10, 1973 and was 34 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)) (R. 31).

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 29, 2008, the date the application was filed (20 CFR 416.920(g)) (R. 32).

## IV.  DISCUSSION

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law."  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

Plaintiff contends:

1.    The ALJ erred because he failed to comply with the Appeals Council's Order on Remand when he relied on vocational expert testimony that was not consistent with the <u>Dictionary of Occupational Titles</u> without resolving the conflict (Plaintiff's brief at p. 6).

2.    The ALJ erred because he failed to comply with the Appeals Council's order on remand when he did not further define the sit/stand option (Plaintiff's brief at p. 8).

3.    The ALJ erred because he failed to comply with the Appeals Council's order on remand when he did not explain the weight given to the treating physician's opinion (Plaintiff's brief at p. 9).

4.    The ALJ erred because he failed to properly consider Listing 1.02A (Plaintiff's brief at p. 11).

The Commissioner contends:

1.    Substantial evidence supports the Commissioner's decision that Plaintiff retained the residual functional capacity to perform sedentary work (Defendant's brief at p. 7).

2.    Substantial evidence supports the ALJ's Step-Three finding (Defendant's brief at p. 8).

3.    The opinion of the treating physician, Dr. Kuzbari, was not entitled to controlling weight (Defendant's brief at p. 10).

4.    The ALJ properly relied on the VE's testimony in response to an appropriate hypothetical question (Defendant's brief at p. 12).

## C. Appeals Council's Order Relative to VE

As her first claim for relief, Plaintiff asserts that the ALJ failed to comply with the Appeals Council's order remanding her claim that instructed the ALJ to further develop and clarify the inconsistencies between the VE's testimony and the <u>Dictionary of Occupational Titles</u> ("<u>DOT</u>"). (Plaintiff's Brief at 6-8.)  Specifically, Plaintiff alleges that the VE's testimony that the job of "general sorter" is unskilled conflicts with the <u>DOT</u>'s description of the job of "general sorter" as

22

semi-skilled. (Id. at 7.) Defendant asserts that the ALJ properly relied on the VE's testimony. (Defendant's Brief at 12-14.)

Where there is a demonstrated impairment, the Commissioner must produce a VE to testify that the claimant retains the ability to perform specific jobs that exist in the national economy. See Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983). The VE's testimony must be based on all of the evidence of record and must be in response to a proper hypothetical question that fairly sets forth all of a claimant's impairments. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). The Commissioner may not rely upon the VE's answer to a hypothetical question if the hypothesis fails to fit the facts. Hincher v. Barnhart, 362 F. Supp. 2d 706, 712 (W.D. Va. 2005).

When relying on VE testimony to support a disability determination, the ALJ is required to "[i]dentify and obtain a reasonable explanation between occupational evidence provided by [vocational experts] and information in the [DOT]." SSR 00-4p, 2000 WL 1898704, at *1 (Dec. 4, 2000) (alteration in original). "When a [vocational expert] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that . . . evidence and information provided in the DOT." Id. at *4 (alteration in original). If a conflict is apparent, the ALJ has the duty to obtain a reasonable explanation for the conflict before relying on the VE's testimony. Id.; see also Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009) (stating that "SSR 00-4p requires the ALJ to obtain an explanation only when the conflict between the DOT and the VE's testimony is 'apparent'"); Fisher v. Barnhart, 181 F. App'x 359, 366, 2006 WL 1328700, at *7 (4th Cir. May 16, 2006) (stating that an ALJ abides by SSR 00-4p when he inquires on the record whether VE testimony is consistent with the DOT). If the VE denies any conflicts when asked by the ALJ, the ALJ's duty ends. Martin v. Comm'r of Soc. Sec., 170 F. App'x

369, 374-75, 2006 WL 509393, at *4-5 (6th Cir. Mar. 1, 2006). A claimant may bring a VE's mistake to the ALJ's attention; however, "[n]othing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct." Terry, 508 F.3d at 478. However, claimants "should not be permitted to scan the record for . . . unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." Young v. U.S. Comm'r of Soc. Sec., No. CV08-0474, 2009 WL 2827945, at *13 (W.D. La. Sept. 1, 2009) (citing Carey v. Apfel, 230 F.3d 131, 142 (5th Cir. 2000)).

Courts have recognized that the DOT's maximum requirements do not necessarily create conflicts and that ALJs are entitled to rely on VE testimony even if the VE's conclusions differ from the DOT. See, e.g., Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005) (despite "minor inconsistencies," VE testimony can still provide substantial evidence for an ALJ's conclusions); Boone v. Barnhart, 353 F.3d 203, 206 (3d Cir. 2003) (declining to adopt a "general rule that an unexplained conflict between a VE's testimony and the DOT necessarily requires reversal"). The DOT's definitions are "simply generic job descriptions that offer 'the approximate maximum requirements for each position, rather than their range.'" Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997) (quoting Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995)). The DOT itself warns that its descriptions "may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." DOT, vol. 1, at xiii. "[N]ot all the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." Hall, 109 F.3d at 1259.

As an initial matter, Plaintiff should not be allowed to raise this argument in his appeal of the ALJ's decision. As noted in the record, Plaintiff's advocate had ample opportunity to cross-examine the VE at the hearing before the ALJ, and she did so. (R. at 52-53.) However, Plaintiff's advocate did not inquire about any possible conflicts between the VE's testimony and the DOT and its companion volume, Selected Characteristics of Occupations ("SCO"). Therefore, Plaintiff should not be allowed to present this as "reversible error, when the conflict was not deemed sufficient enough to merit adversarial development in the administrative hearing." Young, 2009 WL 2827945, at *13.

Here, the record is clear that the ALJ met his responsibility of inquiring of the VE whether there were any conflicts between the DOT and his testimony. The ALJ specifically asked, "And is anything in your testimony inconsistent with anything contained in the DOT?" (R. at 52.) The VE replied, "I don't believe so, Your Honor." (Id.) Therefore, the ALJ abided by SSR 00-4p by asking the VE whether his testimony was consistent with the DOT. See Fisher, 181 F. App'x at 366, 2006 WL 1328700, at *7. Accordingly, the ALJ's duty ended when the VE denied any inconsistencies or conflicts. Martin, 170 F. App'x at 374-75, 2006 WL 509393, at *4-5. He had no "affirmative duty . . . to conduct an independent investigation into the testimony of [the VE] to determine if [he was] correct." Terry, 508 F.3d at 478.

Furthermore, because Plaintiff did not identify any conflict at the hearing, "she would have to show that the conflict was 'obvious enough that the ALJ should have picked up on [it] without any assistance.'" Id. (quoting Overman v. Astrue, 546 F.3d 456, 462-63 (7th Cir. 2008)). Plaintiff is correct that the job of general sorter is classified as having a "Specific Vocational Preparation: Level 3–Over 1 month up to and including 3 months," DOT 209.687-022, 1991 WL 671812; that

unskilled work is work that can generally be learned in at most 30 days, 20 C.F.R. § 416.968(a); and that the Administration has stated that "unskilled work corresponds to an SVP of 1-2," SSR 00-4p, 2000 WL 1898704, at *3. However, because Plaintiff "did not bring the [VE's] mistake to the ALJ's attention, the ALJ did not need to explain how the conflict was resolved." Boggs v. Astrue, No. 2:12-cv-25, 2012 WL 5494566, at *7 (N.D. W. Va. Nov. 13, 2012). Furthermore, given that the DOT's definitions contain the maximum requirements for each position, see Hall, 109 F.3d at 1259, Plaintiff's "'reliance on the DOT as a definitive authority on job requirements is misplaced.'" Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000) (quoting Hall, 109 F.3d at 1259)).

Given this, the undersigned finds that Plaintiff's argument is without merit. The undersigned further notes that while the ALJ did limit Plaintiff to sedentary work, he never limited her to unskilled work. (R. at 27.) Accordingly, substantial evidence supports the ALJ's determination that a significant number of jobs in one or more occupations exist in the national economy that Plaintiff can perform. See 20 C.F.R. § 416.1520(a)(4).

### D. Appeals Council's Order Relative to Sit/Stand Option

Plaintiff next alleges that the ALJ erred because he failed to comply with the Appeals Council's remand directive that the ALJ further define the sit/stand option in Plaintiff's RFC. (Plaintiff's Brief at 8.) Specifically, Plaintiff argues that while the ALJ did state how long she could sit or stand at one time, he failed to make a specific finding as to the frequency of her need to alternate sitting and standing. (Id. at 8-9.) Defendant states that it is implicit in the ALJ's decision that the frequency of Plaintiff's need is at her will. (Defendant's Brief at 14.) In her reply, Plaintiff

argues that any post hoc rationalization by the Commissioner for the ALJ's failure to address frequency is barred by the <u>Chenery</u> doctrine.[6]  (Plaintiff's Reply at 4.)

In pertinent part, SSR 83-12 provides the following guidance to an ALJ when making a disability determination for a claimant requiring a sit/stand option:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing.  The individual may be able to sit for a time, but must then get up and stand or walk for a while before returning to sitting.  Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work.  (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)
>
> There are some jobs in the national economy–typically professional and managerial ones–in which a person can sit or stand with a degree of choice.  If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled.  However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task.  Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will.  In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

SSR 83-12, 1983 WL 31253, at *4 (Jan. 1, 1983).  Furthermore, SSR 96-9p provides guidance to an ALJ when making a disability determination for a claimant who has the RFC for less than a full range of sedentary work and who requires a sit/stand option:

> **Alternate sitting and standing:** An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically.  Where this need cannot be accommodated by scheduled breaks and a lunch period, the

---

[6]  This doctrine emphasizes a fundamental rule of administrative law that a reviewing court, when dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  <u>See</u> <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 87-88 (1943).

occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996).

At Step Four, the ALJ determined that Plaintiff had the following RFC:

After careful consideration of the entire record, the undersigned finds that since February 29, 2008, the claimant has had the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 416.967(a) with the following limitations: the claimant requires a sit/stand option without breaking task, with the added condition that she has the ability to sit and stand for 20 minutes each at a time; she can perform postural movements occasionally, except she cannot climb ladders/ropes/scaffolds, should do minimal kneeling, crawling, or squatting, and should do no push/pull maneuvers with the lower extremities; to the maximum extent possible, the claimant should do all walking on level and even surfaces; lastly, the claimant should have no exposure to temperature extremes, wet or humid conditions, or hazards.

(R. at 27.) The ALJ assigned Plaintiff an RFC of less than the full range of sedentary work.

The undersigned finds that by stating that Plaintiff had "the ability to sit and stand for 20 minute each at a time," the ALJ complied with the Appeals Council's direction that on remand, he be specific as to the duration of her need to alternate sitting and standing. The undersigned further finds that the ALJ did not specify the frequency of Plaintiff's need to change positions. However, "the reasonable implication of an ALJ's silence regarding the frequency of a claimant's need to alternate between sitting and standing is that the sit/stand option is 'at-will,' 'as needed,' or otherwise at a claimant's own volition." Ruff v. Colvin, No. 1:12-cv-165-RJC, 2013 WL 4487502, at *7 (W.D.N.C. Aug. 20, 2013) (citing Wright v. Astrue, No. 1:09-cv-3, 2012 WL 182167, at *8 (M.D.N.C. Jan. 23, 2012)); see also Pierpalio v. Astrue, C/A No. 4:10-2401-CMC-TER, 2011 WL

28

7112913, at *6 (D.S.C. Dec. 15, 2011) (quoting <u>Williams v. Barnhart</u>, 140 F. App'x 932, 936-37 (11th Cir. 2005)) (same); <u>Foster v. Astrue</u>, No. 3:08-cv-960-J-12HTS, 2009 WL 4757239, at *2 (M.D. Fla. Dec. 10, 2009) (same); <u>Young v. U.S. Comm'r of Soc. Sec.</u>, No. CV08-0474, 2009 WL 2827945, at *12 (W.D. La. Sept. 1, 2009) (same).

Here, the undersigned finds that the reasonable implication is that the frequency of Plaintiff's need to alternate sitting and standing was at her own volition. Plaintiff has not presented any evidence explaining why she could not perform the jobs identified by the VE based upon her ability to sit and stand, and Plaintiff's counsel did not question the VE during the hearing regarding the impact of the sit/stand option. <u>See</u> <u>Ruff</u>, 2013 WL 4487502, at *8. Accordingly, the undersigned finds that the ALJ did not fail to comply with the Appeals Council's direction that he specify the frequency and duration of Plaintiff's need to alternate sit and standing, and the ALJ's findings are supported by substantial evidence.

### E. Appeals Council's Order Relative to Weight Given to Treating Physician

Plaintiff next alleges that the ALJ erred by failing to comply with the Appeals Council's remand order that he further consider Plaintiff's RFC by evaluating the treating, examining, and nonexamining source opinions contained in the record and explaining the weight given to that opinion evidence. (Plaintiff's Brief at 9.) Specifically, Plaintiff asserts that the ALJ erred by not explaining the weight he assigned to Dr. Kuzbari's opinions. (<u>Id.</u> at 9-11.) Defendant asserts that Dr. Kuzbari's opinion was not entitled to controlling weight. (Defendant's Brief at 10-12.)

20 C.F.R. § 404.1527 states:

(c) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*.  Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship*.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (I) *Length of the treatment relationship and the frequency of examination*.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*.  The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*.  When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it."  Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996).  The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983).  In Craig, however, the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d at 590. Furthermore, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983).

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977). The Administration has discussed the explanation of the weight to be given to a treating source's medical opinion, as follows:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:

> When the determination or decision:

\*is not fully favorable, e.g., is a denial; or

\*is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;

the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at \*5 (July 2, 1996).

With regards to Dr. Kuzbari's opinion, the ALJ wrote as follows:

The undersigned has also considered the opinions by the claimant's family physician, Sam Kuzbari, M.D. but declines to give them controlling weight (Exhibits 7F, 10F, and 14F). Although Dr. Kuzbari places some limits on the claimant's sitting, walking and standing, postural, and push/pull ability, the undersigned is unclear what specific objective findings this is based on. Dr. Kuzbari's treatment notes do not include any functional capacity testing or list and specific functional restrictions, but actually include advice for the claimant to exercise (Exhibit 5F/1). Further, Dr. Kuzbari's own treatment records indicate that the claimant was "working out" which appears contradictory to the specific functional limitations he listed. Finally, Dr. Kuzbari is not an orthopedist, and the claimant's appointments appear primarily for prescription refills and injection purposes based on the claimant's subjective reporting of her symptoms; the extreme limitations suggested by Dr. Kuzbari are in no way supported by the objective medical evidence of record. Nonetheless, the undersigned has given Dr. Kuzbari's opinions appropriate weight and has included a sit/stand option, push/pull limitations, and postural and environmental limitations in the residual functional capacity.

(R. at 30.)

Here, by assigning "appropriate weight" to Dr. Kuzbari's opinion, the ALJ "utilized a vague and imprecise term." Chirico v. Astrue, 3:10CV689, 2011 WL 6371315, at \*5 (E.D. Va. Nov. 21, 2011). While the ALJ did provide reasons for assigning "appropriate weight" to Dr. Kuzbari's opinions, the fact remains that the term "appropriate weight" insufficiently defines the weight being

assigned. Indeed, "assigning 'appropriate weight' necessarily resorts to circular reasoning, as the ALJ is required by law to assign appropriate weight to any and all medical evidence." Id.

Nevertheless, the undersigned finds that the ALJ's error is harmless. Cf. Ngarurih v. Ashcroft, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached." (internal quotation marks omitted)). On February 2 , 2009, August 32, 2011, and March 21, 2012, Dr. Kuzbari noted that Plaintiff could only sit and stand for twenty minutes each at a time. (R. at 321, 368, 369.) As noted above, the ALJ's assessment of Plaintiff's RFC incorporated this opinion, as the ALJ noted that Plaintiff "has the ability to sit and stand for 20 minutes each at a time." (R. at 27.) Furthermore, on November 29, 2011, Dr. Kuzbari completed a Medical Assessment of Ability to do Work-Related Activities for Plaintiff. He noted that Plaintiff could never climb, kneel, or crawl; could occasionally balance and stoop; and that her impairments affected her ability to push and pull. (R. at 337.) He also stated that Plaintiff should avoid moving machinery, humidity, and vibration. (R. at 338.) The ALJ incorporated several of these opinions into Plaintiff's RFC, as he noted that Plaintiff:

> can perform postural movements occasionally, except she cannot climb ladders/ropes/scaffolds, should do minimal kneeling, crawling, or squatting, and should do no push/pull maneuvers with the lower extremities; . . . lastly, the claimant should have no exposure to temperature extremes, wet or humid conditions, or hazards.

(R. at 27.)

Given this, the undersigned finds that Dr. Kuzbari's opinions were substantially consistent with the ALJ's determination of Plaintiff's RFC. Accordingly, the ALJ's failure to expressly state the weight he assigned to Dr. Kuzbari's opinion is harmless error. See Morgan v. Barnhart, 142 F. App'x 716, 722-23 (4th Cir. 2005) ("Any error the ALJ may have made in rejecting Dr. Holford's medical opinion, which provided essentially the same time restriction on sitting and standing as the FCE, was therefore harmless."); Rivera v. Colvin, No. 5:11-CV-569-FL, 2013 WL 2433515, at *3 (E.D.N.C. June 4, 2013) ("[A]n ALJ's failure to expressly state the weight given to a medical opinion may be harmless error, when the opinion is not relevant to the disability determination or when it is consistent with the ALJ's RFC determination."); Bautista v. Astrue, Civil No. TJS-11-1651, 2013 WL 664999, at *6 (D. Md. Feb. 22, 2013) ("Assuming, for the sake of argument, that the ALJ erred by failing to assign weight to all of the opinion evidence in the record, the error could not have affected the outcome of the proceedings."). Therefore, the undersigned finds that remand for a determination of the express weight is unnecessary. Cf. Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.").

## F. Listing 1.02A

Plaintiff also alleges that the ALJ failed to properly consider whether she was disabled because of a major dysfunction of a joint pursuant to Listing 1.02A. (Plaintiff's Brief at 11.) Specifically, Plaintiff argues that the "ALJ summarily dismissed Listing 1.02A without offering any actual discussion of the medical evidence in relation to the Listing despite the fact that the evidence of record showed [Plaintiff's] condition met the requirements of the Listing." (Id.) Defendant

asserts that substantial evidence supports the ALJ's decision because Plaintiff failed to meet her

burden under Step Three of the sequential evaluation. (Defendant's Brief at 8-10.)

Listing 1.02A provides, in pertinent part:

1.02 *Major Dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

1.00B2b provides:

**What We Mean by Inability to Ambulate Effectively**

(1) *Definition*. Inability to ambulate effectively means an extreme limitation of the ability to walk: *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand held assistive device(s) that limits the functioning of both upper extremities . . . .

(2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

The Commissioner argues that Plaintiff failed to meet her burden of proving that her

impairments satisfy listing Listing 1.02A. He cites <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990),

for the proposition that "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." The undersigned finds that the Commissioner has taken this quote out of context. It is a correct quote for then-existing SSR 83-19. However, it is not the ruling in Sullivan. Instead, the Sullivan Court held that the Commissioner's regulations and rulings requiring that a child could only qualify for SSI if he met a listing "did not carry out the statutory requirement that SSI benefits shall be provided to children with 'any . . . impairment of comparable severity' to an impairment that would make an adult 'unable to engage in any substantial gainful activity.'" Id. at 541. Therefore, Sullivan has no value to resolution of the specific issue raised by Plaintiff.

When evaluating whether a claimant meets one or more of the listed impairments, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). "This requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairments in more than a "summary way." Id. at 1173. "The ALJ is required to give more than a mere conclusory analysis of the plaintiff's impairments pursuant to the regulatory listings." Fraley v. Astrue, No. 5:07CV141, 2009 WL 577261, at *25 (N.D. W. Va. Mar. 5, 2009) (citing Warner v. Barnhart, Civil Action No. 1:04-cv-8, Docket No. 18 at 7-9, 11 (Final Order of Stamp, J., filed Mar. 29, 2005)).

In Warner, Judge Stamp found that the ALJ "simply restate[d] verbatim the language of Listing 1.04 and Listing 14.09. Without analysis, the ALJ dismisse[d] the applicability of the listings:

> The undersigned does not believe that the claimant has nerve root compression with limitation of motion of the spine, motor loss with sensory or reflex loss, evidence of inflamed arachnoidal tissue resulting in the need for change of position or posture every two hours, or evidence of stenosis that results in an inability to ambulate

effectively. The objective medical evidence also does not show that the claimant had a history of joint pain, swelling and tenderness, with signs of current physical examination of joint inflammation or deformity in two or more major joints resulting in an inability to ambulate effectively or an inability to perform fine and gross movements effectively. The undersigned finds that the claimant did not meet or medically equal any physical listing.

Warner, Civil Action No. 1:04-cv-8, Docket No. 18 at 8.

With respect to Plaintiff's impairments and whether they met Listing 1.02A, the ALJ wrote:

[T]he undersigned has appropriately evaluated medical and other evidence pertaining to the claimant's medically determinable impairments in conjunction with all relevant severity criteria contained within, and including, but not limited to, the *1.00 Musculoskeletal System (including listing 1.02) and 4.00 Cardiovascular System (including listing 4.11)* series of listed impairments.

More specifically relating to the claimant's knees, the medical evidence of record failed to establish that the claimant had any gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion, or other abnormal motion of the affected joint(s), and findings of joint space narrowing, bony destruction or ankylosis, resulting in an inability to ambulate effectively, which is necessary to meet or medically equal the criteria of listing 1.02(A).

R. at 26.)

The undersigned finds that the ALJ in Plaintiff's case committed the same error made by the ALJ in Warner. Here, the ALJ simply restated a substantial portion of the language of Listing 1.02A without providing any analysis. Because of this, the ALJ did not meet the requirements of Cook, as he did not compare Plaintiff's "actual symptoms to the requirements of [Listing 1.02A] in more than a 'summary way.'" Cook, 783 F.2d at 1173. As the Fourth Circuit noted in Cook, "[a]dministrative determinations are required to be made in accordance with certain procedures that facilitate judicial review." Id. Here, the undersigned finds no explanation that the Court can rely on that indicates why Plaintiff does not meet Listing 1.02A.

As for the requirements of Listing 1.02A, evidence in the record indicates that Plaintiff may have gross anatomical disformity. On January 1, 2008, an X-ray of Plaintiff's right knee showed that "lateral patellar subluxation [has] progressed." (R. at 288.) The ALJ did not discuss this piece of evidence anywhere in his decision. Furthermore, on April 29, 2009, an X-ray of Plaintiff's bilateral knees showed "lateral subluxation of the tibia relative to the femur" in her right knee. (R. at 302.) There is also medical evidence referencing chronic joint pain and stiffness. For example, Plaintiff visited Dr. Lefebure on December 21, 2007 for an injection to her right knee because of her "persistent pain" there. (R. at 270.) On April 29, 2008, Plaintiff saw Dr. Hamlin for an evaluation of her bilateral knee pain, and he noted that she experiences "rather severe pain and difficulty doing activities of daily living." (R. at 298.) Furthermore, Dr. Kuzbari's treatments notes indicate that Plaintiff experienced chronic knee pain, especially in her right knee. (See R. at 305-06, 323-27, 334-35, 370.) On February 2, 2009, Dr. Kuzbari noted that Plaintiff "suffers severe pain osteoarthritis in both knees with severe pain constantly." (R. at 321.)

The record also contains medical evidence that Plaintiff may suffer from "limitation of motion or other abnormal motion of the affected joint." On July 26, 2006, Dr. Lefebure noted that as to Plaintiff's right knee, "the patella has obvious grinding." (R. at 269.) He also stated on November 7, 2007, that Plaintiff exhibited "definite subpatellar knee crepitation with motions." (R. at 270.) On April 29, 2008, Dr. Hamlin noted that Plaintiff has "patellofemoral crepitance." (R. at 299.) The record further contains "findings on appropriate medically acceptable imaging of joint space narrowing." On January 30, 2008, an X–ray of Plaintiff's right knee showed "[d]egenerative loss of joint space in all 3 compartments." (R. at 288.) On April 29, 2008, another X-ray of

Plaintiff's right knee showed "joint space narrowing, more severe on the medical aspect." (R. at 302.)

Finally, the record also contains evidence that Plaintiff may suffer from an inability to ambulate effectively. The undersigned notes that the ALJ himself, in his assessment of Plaintiff's RFC, found that "to the maximum extent possible, [Plaintiff] should do all walking on level and even surfaces." (R. at 27.) Furthermore, Dr. Lateef completed a Physical Residual Functional Capacity Assessment of Plaintiff on September 25, 2008. In this assessment, she noted that Plaintiff could not balance on steep, narrow, wet, or erratically moving surfaces. (R. at 314.) As such, these may indicate that Plaintiff is unable to walk a block at a reasonable pace on rough or uneven surfaces, one of the examples of ineffective ambulation in 1.00B2b.

In sum, the undersigned finds that substantial evidence does not support the ALJ's Step Three analysis because he did not adequately analyze Listing 1.02A and that his explanation does not satisfy the requirements of Cook. Accordingly, the undersigned recommends that Plaintiff's case be remanded to the Commissioner for further discussion and analysis of whether Plaintiff's impairments meet Listing 1.02A.

## V. CONCLUSION

Upon consideration of all the above, the undersigned United States Magistrate Judge finds and concludes that substantial evidence does not support the ALJ's determination that Plaintiff was not disabled during the relevant time period, and recommends that the case be reversed and remanded for the Commissioner to provide further discussion and analysis of whether Plaintiff's impairments meet Listing 1.02A.

## VI. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is not supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **DENIED**, and the Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within fourteen (14) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record

Respectfully submitted this __11__ day of *February*, 2014.


_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE